515 A.2d 454

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**James Henry GILBERT.**

**Misc. Docket (Subtitle BV) No. 6, Sept. Term, 1985.**

Court of Appeals of Maryland.

Oct. 6, 1986.

Motion for Reconsideration Denied Nov. 21, 1986.

Melvin Hirshman, Bar Counsel and Glenn M. Grossman, Asst. Bar Counsel for Atty. Grievance Com'n of Maryland, Annapolis, for petitioner.

James Henry Gilbert, Baltimore, pro se.

Argued March 5, 1986, before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

Reargued Sept. 8, 1986, before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, COUCH, McAULIFFE and ADKINS, JJ.

MURPHY, Chief Judge.

This case involves a petition for disciplinary action filed by the Attorney Grievance Commission against James Gilbert, a member of the Maryland Bar since 1983. The Commission seeks Gilbert's disbarment for a claimed violation of DR 1–101(A) and DR 1–102(A)(1) and (4) due to his alleged intentional failure to disclose a material fact in his 1980 application for registration as a candidate for admission to the Maryland Bar.[1] Specifically, the nondisclosure was of a civil suit filed by Gilbert in which he unsuccessfully sought, as beneficiary, to recover the proceeds of several

---

1. DR 1–101(A) states:
    "(A) A lawyer is subject to discipline if he has made a materially false statement in, or if he has deliberately failed to disclose a material fact requested in connection with, his application for admission to the bar."
  DR 1–102(A)(1) and (4) provide:
    "(A) A lawyer shall not:
        (1) Violate a Disciplinary Rule.
        . . .
        (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

life insurance policies procured by him on his deceased wife's life three months prior to her murder.

## I.

Prior to his admission to the Maryland Bar, Gilbert was involved in a series of criminal incidents, all of which occurred over a six-month period in 1967. As a result, he was charged with conspiracy to commit forgery, forgery and uttering, murder and accessory to commit murder, homicide and assault. He pled *nolo contendere* to the charge of conspiracy to commit forgery for which in 1968 he received a suspended sentence. He was found guilty of six counts of forgery and uttering arising out of the use of a misappropriated credit card and received a sentence of twenty months to five years incarceration. Shortly after his enrollment in law school, he was arrested on murder and aggravated assault charges arising out of a Halloween night stabbing of a gas station attendant by one of his companions. Gilbert was found not guilty of these offenses; subsequently, he pled *nolo contendere* to simple assault for which he received a suspended sentence. During this same period in 1967, Gilbert was arrested for murder and conspiracy to commit murder in connection with the murder of his wife on June 4, 1967. He was indicted for these offenses, along with his sister, on March 13, 1969. The charges against Gilbert were nol prossed on June 24, 1974, following his sister's acquittal on March 13, 1972.

Gilbert was initially incarcerated without bond until December 1967 and was later imprisoned for twenty-one months from November 1970 to August 1972 upon his convictions for forgery and uttering. As a result, he was unable to continue law school. He resumed his law school studies after his release from incarceration and graduated in 1980. He completed his application for admission to the Bar of Maryland on May 20, 1980. On May 29, 1980, Gilbert filed a petition for the expungement of all records associated with the nol prossed indictment for his wife's murder. The petition was granted on June 23, 1980. Gil-

bert successfully passed the July 1980 Bar Examination. Thereafter, the character investigation process was initiated to determine Gilbert's present moral character fitness for admission to the Maryland Bar.

The Character Committee of the Third Judicial Circuit held a hearing on October 21, 1980 to determine whether Gilbert currently possessed the requisite moral character to justify his admission to the Bar. *See* Rule 4 of the Rules Governing Admission to the Bar. The Committee unanimously recommended to the State Board of Law Examiners that Gilbert be denied admission. As authorized by Rule 4 c, the Board conducted its own evidentiary hearing on November 2, 1981; by a 3–2 vote, it concluded that Gilbert had demonstrated his present moral character fitness and recommended that he be admitted.

We considered the matter at a hearing "upon the records made by the Character Committee and the Board." Rule 4c. A divided Court ordered Gilbert's admission after concluding that the evidence was clear and convincing that he was completely rehabilitated and presently possessed good moral character. *See In re Application of James G.,* 296 Md. 310, 462 A.2d 1198 (1983). In so concluding, we were conscious of Gilbert's difficult life experiences, including the continuous conflict between his parents that culminated in their separation; the birth of a Downs Syndrone child during his first marriage in 1964; and the fact that his first wife had been the victim of a murder in 1967. In arriving at our evaluation of Gilbert's present moral character, we took into consideration the nature of the offenses for which he was convicted; that all his criminal offenses occurred within a six-month period; that the murder charge involving his wife's death was nol prossed; that sixteen years had since passed; that Gilbert had been admitted to the Bar of the District of Columbia in 1981 and had performed as a lawyer without any negative incidents; and that although Gilbert's crimes were serious and involved moral turpitude, he candidly and "readily admitted his responsibility for and his participation in the crimes in which he was involved and

his remorse is fully evident and genuine." 296 Md. at 316, 462 A.2d 1198.

Shortly after his admission to the Maryland Bar, Gilbert's involvement as a plaintiff in a civil suit, not disclosed on his admission application, came to the attention of the Attorney Grievance Commission. That suit was filed by Gilbert on June 4, 1970 in the Circuit Court for Baltimore County to recover $110,000, representing the proceeds from two insurance policies which Gilbert had obtained insuring his wife's life. The insurer had declined to pay the proceeds to Gilbert as beneficiary, contending that he was not entitled to them because he had intentionally caused the death of his wife. At the conclusion of an evidentiary non-jury trial on November 10, 1970, Judge Kenneth C. Proctor denied Gilbert's claim to the proceeds, finding that "the evidence is overwhelming that [Gilbert] intentionally caused the death of his wife in order to reap the harvest, namely, the proceeds of these two life insurance policies, so that he could live, according to his light, happily ever after."

In so concluding, Judge Proctor related in an oral opinion that the evidence showed that three months before his wife's murder, Gilbert obtained the two policies insuring his wife's life. The murder took place at a tourist home operated by Gilbert and his wife. According to Gilbert's sister, Janet, the door buzzer sounded that night and she answered. At the door was a man with a knife. He followed Janet upstairs to where Gilbert's wife was watching television. Gilbert was not then present. The intruder forced Gilbert's wife into another room, demanded money from her and then, almost immediately, shot her with a gun which Gilbert and his wife had purchased the day prior to the crime. According to Janet, she picked up the gun and shot at the assailant, who escaped.

Judge Proctor deemed it suspicious that Janet's fingerprints were not found on the murder gun. He expressed concern that there was no explanation as to how the murderer obtained possession of the gun; that while the mur-

derer demanded money, he immediately shot the victim without any further attempt to complete a robbery; that Janet waited a substantial time before calling the police; and that Gilbert inexplicably called home at 2:00 A.M.—about an hour after the police arrived on the scene—from his employer's home where he had spent the evening.

Judge Proctor noted that there was testimony from Gilbert's employer that Gilbert told him he paid $5,000 to have his wife killed. There was evidence tending to corroborate this testimony from police witnesses who overheard an incriminating conversation between Gilbert and his employer while on a stakeout at the employer's home.

In completing his application to the Maryland Bar, Gilbert did not mention this civil suit despite the fact that Question 10 of the admission application required the following information:

> "a complete list of all suits in equity, actions at law, suits in bankruptcy or other statutory proceedings, matters in probate, lunacy, guardianship, and every other judicial or administrative proceedings of every nature and kind, except criminal proceedings, to which I am or have ever been a party: (If 'None' so state)."

Gilbert answered "None" to this question.

## II.

Following an evidentiary hearing before an Inquiry Panel, and upon the recommendation of the Review Board, the Attorney Grievance Commission filed its petition for disciplinary action on April 9, 1985, averring that Gilbert had intentionally failed to disclose a material fact by his negative answer to Question 10 of the admission application, and that he thereby violated the previously quoted disciplinary rules. We referred the matter pursuant to Maryland Rule BV9 b to Judge Raymond G. Thieme, Jr. of the Circuit Court for Anne Arundel County. After two evidentiary hearings, Judge Thieme filed extensive factual findings, concluding that Gilbert had intentionally failed to disclose the civil suit; that the information thereby withheld was of

material fact; that the Character Committee, the State Board of Law Examiners, and this Court were deliberately deprived of material information; and that Gilbert had thereby violated DR 1–101(A) and DR 1–102(A)(1) and (4).

Gilbert has taken exception to Judge Thieme's finding that he intentionally failed to disclose the *Bankers Life* litigation. Specifically, he objects to Judge Thieme's finding that he largely completed his application on May 17, 1980, and held it for three days before submitting it on May 20, 1980. He also contends that Judge Thieme could not properly find that he gave varying explanations for his failure to disclose *Bankers Life* on his application and that the language of Question 10 was clear. While Gilbert now concedes that Question 10 requires the inclusion of all civil suits, he argues that applicants might think that Question 9(c) and (d)[2] required disclosure of all lawsuits where money is sought and that Question 10 concerns only civil suits other than where money is sought. Furthermore, as evidence that he misread Question 10, Gilbert notes that

---

**2.** Question 9(c) and (d), and Gilbert's responses, were as follows:

"(c)  Are there any unsatisfied judgments against you?  yes
                                                        Yes or No
(which have been paid but for which I have not yet received an order of satisfaction)  A default judgment was entered against me in January, 1969 when I was incarcerated.  I recently learned of it.  I have written a letter to the clerk of the circuit court requesting that it be set aside.

"(d)  Have any judgments ever been entered against you?  yes (1)
                                                         Yes or No
If so, furnish certified copies of such judgments, whether satisfied or unsatisfied, and the names and present addresses (with zip code) of the holders.  The judgment was for approx. $88.05 obtained by May Department Stores (Hecht's).  Their attorney is Phillip Heller Sachs, 343 North Charles St., Baltimore, Md. 21201.  Order of satisfaction forthcoming, see (c) above."

there were five other civil suits that he did not list in response to that question. He insists the failure to list these suits could not have been purposeful because their disclosure would not have prejudiced his application.

At the first hearing before Judge Thieme, Gilbert said that he did not remember why he answered "none" to the application's question about involvement in civil litigation. He suggested that he misread the question, and that the haste with which he completed the application contributed to this misreading. He claimed that he would have answered Question 10 correctly if he had not misread it. Furthermore, he maintained that he had disclosed the existence of judgments against him in answer to Question 9 of the application, and that he also revealed his involvement in "lawsuits" in the character interview. He suggested that the Character Committee had focused on his criminal record and thus precluded him from making a more detailed disclosure of his involvement in "lawsuits," specifically the *Bankers Life* case.

In his factual findings, Judge Thieme characterized the language of Question 10 as very clear. He did not believe that Gilbert completed the application in any particular hurry. He noted that Gilbert admitted that he had the application for some time and had procrastinated in filling it out. From the dates of Gilbert's signatures on the application and its addendum, Judge Thieme concluded that he completed Question 10 at least three days before submitting the application, and that this fact undermined his claim of hurried preparation.

Judge Thieme also found significant Gilbert's failure to disclose the *Bankers Life* suit at any time during his protracted admission process. While recognizing that Gilbert had mentioned "some civil suits," Judge Thieme observed that he provided no details beyond those concerning an $88 judgment contained in his answer to Question 9. Moreover, he noted that when Gilbert was asked about the reasons for the police suspecting his involvement in his

wife's murder, he responded only that his in-laws had been pursuing a vendetta, failing to mention that Judge Proctor had found "overwhelming evidence" that he had caused his wife's death.

Although Judge Thieme acknowledged the concentration on Gilbert's criminal record during the admission process, he observed that Gilbert controlled the flow of information during the hearings. Furthermore, he said that the informality of the process provided ample opportunity for Gilbert to volunteer information omitted from his application.

■■ Judge Thieme's factual findings are, of course, prima facie correct and Gilbert's exception to the intent finding will not be disturbed unless clearly erroneous. *Attorney Griev. Comm'n v. Kemp*, 303 Md. 664, 674, 496 A.2d 672 (1985). Based on our review of the record, we are unable to say that Judge Thieme's finding that Gilbert intentionally failed to disclose the *Bankers Life* suit was clearly erroneous. Judge Thieme clearly did not believe Gilbert's explanation for his failure to disclose *Bankers Life*. Ordinarily, the factfinder may believe or disbelieve a witness' testimony. *Gray v. Dep't of Correction*, 230 Md. 508, 511–12, 187 A.2d 860 (1963). Question 10 plainly asks applicants to list their involvement in civil litigation. That a law school graduate would not understand this question strains our imagination, as it did of Judge Thieme. The dates on the application do indicate, as Judge Thieme found, that Gilbert completed the application over a three-day period, not in haste as Gilbert claimed. *See In re Application of G.L.S.*, 292 Md. 378, 389, 439 A.2d 1107 (1982) (application on its face contradicted applicant's claim of hurried preparation). Furthermore, Judge Thieme did not conclude that Gilbert gave varying explanations for his failure to disclose *Bankers Life*. Rather, he characterized Gilbert's explanation as "several species of the claim that he misread question 10." And although by a footnote he took cognizance of Gilbert's testimony before the Inquiry Panel, Judge Thieme did not rely on such testimony, but rather on Gilbert's testimony at

the hearing before the court. We thus find no merit in Gilbert's exceptions relating to Judge Thieme's finding of intent.

Gilbert has also excepted to Judge Thieme's conclusion that the non-disclosure was material. He argues that the information requested by Question 10 had no bearing on the principal issue of his present moral character. He suggests that the Character Committee evinced no interest in his involvement in civil litigation and thus would not have investigated the *Bankers Life* suit had it been disclosed. Further, he contends that his comment that he had been involved in "lawsuits" sufficiently alerted the Committee to the need for further inquiry.

Gilbert also argues that the *Bankers Life* suit involved the same issues as were involved in the criminal case and that by disclosing and discussing at length the indictment for the murder of his wife, he disclosed all the information that would have been available in the *Bankers Life* suit.

In rejecting these arguments, Judge Thieme said that the Character Committee had no reason to question Gilbert about his involvement in civil litigation since he answered "none" to Question 10, and only revealed the $88 judgment against him listed in Questions 9(c) and 9(d). Given the committee's close questioning of Gilbert concerning the murder charges, Judge Thieme found that his failure to disclose Judge Proctor's finding of involvement in his wife's death was of benefit to him in the character assessment process.

Nor did Judge Thieme find merit in Gilbert's contention that disclosure of the criminal indictment was tantamount to disclosure of the civil action. He said:

"This is not true. The criminal charges against Gilbert were never tried and no evidence of his involvement in Mrs. Gilbert's death was adduced. Gilbert was free to characterize the charges against him, which he did in a very self-serving manner. The civil action, on the other hand, including an affirmative defense alleging that Gil-

bert caused his wife's death, was tried to a conclusion. *Bankers Life* presented evidence of Gilbert's involvement in that murder. A detailed summary of this evidence was included in Judge Proctor's opinion which concluded:

'[T]he evidence is overwhelming that Gilbert intentionally caused the death of his wife in order to reap the harvest, namely, the proceeds of these two life insurance policies....'

This contrasts sharply with Gilbert's evaluation of the criminal charges as the groundless products of a family vendetta or inept prosecution.

"Judge Proctor's findings destroy the credence of Respondent's assertion that he had nothing to gain by not disclosing *Bankers Life* and his further assertion that the facts not disclosed were not material to his application. In view of the three narrow votes which preceded Respondent's admission to the Bar, this Court finds that Respondent certainly benefited from the freedom he enjoyed to characterize the charges against him without contradiction."

We have not previously construed the word "material" in the context of its usage in DR 1–101(A). In *Matter of Howe*, 257 N.W.2d 420, 422 (N.D.1977), however, the North Dakota Supreme Court defined a material omission within the contemplation of the same disciplinary rule as one that "has the effect of inhibiting the efforts of the bar to determine an applicant's fitness to practice law."

This definition accords with judicial determinations of materiality in other contexts. For example, in ruling on a summary judgment motion, the court must determine whether the resolution of any material matter of fact may affect the outcome of the case. *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985); *Lynx, Inc. v. Ordnance Products, Inc.*, 273 Md. 1, 8, 327 A.2d 502 (1974). Similarly, a misrepresentation or omission in an application for insurance is material if it would affect the insurer's decision about providing insurance or evaluating the risk. *Mary-*

*land Indemnity v. Steers,* 221 Md. 380, 385, 157 A.2d 803 (1960). In the law of evidence, materiality "is a broad concept that is generally understood to include any evidence which is reasonably capable of influencing a tribunal's decision, but it does not require that the evidence will *necessarily* do so." (Emphasis in original.) *Breedon v. Maryland Dep't of Educ.,* 45 Md.App. 73, 84, 411 A.2d 1073 (1980). *See also Restatement of Torts* (Second) § 538(2)(a) (1976) (materiality of representation determined by the importance a reasonable person would attach to fact in determining course of action).

These standards focus on the effect of the particular fact or representation on the decision-making process. They are consistent with the *Howe* standard, which we adopt, for determining the materiality under DR 1–101(A) of an omission or false statement on a bar admission application.

■ We agree with Judge Thieme that the omitted information was clearly material. As he found, Gilbert's failure to disclose the *Bankers Life* suit kept highly relevant information concerning his wife's murder from the Character Committee, the Board and from us. It also enabled Gilbert to characterize the criminal charges against him in a self-serving and plausible fashion. Since the criminal charges were dismissed and expunged before the character evaluation process was initiated, the investigation's central focus was upon Gilbert's criminal convictions and the evidence that he had since been rehabilitated. That the nondisclosure of the civil suit plainly inhibited efforts to assess Gilbert's present moral character fitness to practice law is, we think, entirely plain.

Such a conclusion, Gilbert suggests, is inconsistent with *In re Application of G.L.S.,* 292 Md. 378, 439 A.2d 1107 (1982). There, the applicant for admission failed to disclose the details of his criminal conviction on his bar application. As he did list the date of the conviction, however, we found that he "provided sufficient information to alert the Committee to the need for further investigation and inquiry."

*Id.* at 397, 439 A.2d 1107. Furthermore, the applicant acknowledged that the information was incomplete and he provided the details during the admission process. Unlike *G.L.S.*, Gilbert never provided the information about *Bankers Life* during the admission process. Manifestly, his comment about "lawsuits," when discussing the existence of a minor, unsatisfied judgment, did not provide any information on which to base further questions.

Gilbert's reliance on the statement in *Howe, supra,* 257 N.W.2d at 422, that the court would not second-guess the bar admission committee is misplaced. What the court said was that in determining materiality, it would not speculate about the course that the admission process would have actually taken had the applicant provided complete information. Thus, Gilbert's suggestion that the Character Committee would in no event have inquired into the details of *Bankers Life* had he disclosed the existence of that litigation, in effect, second-guesses the effect of complete disclosure on the Committee and contradicts the direction in *Howe.*

## III.

█ Gilbert also takes exception to several evidentiary rulings made by Judge Thieme. He first asserts that Judge Thieme erroneously admitted the *Bankers Life* file in evidence, contending that that litigation had no relevance to the disciplinary proceedings because Question 10 did not require the actual disclosure of the information contained in the civil case. He also claims that there was no evidence to show that his disclosure of *Bankers Life* would have caused a Character Committee or Board member to locate and read the file. The civil case file, however, demonstrates what information would have been available had Gilbert disclosed the existence of the lawsuit, as required in Question 10. Such information is obviously relevant to the determination of whether Gilbert deliberately failed to disclose a material fact during the admission process and thus bears directly on his present moral character fitness to practice law.

■ Gilbert next objects to Judge Thieme's hearsay exclusion of much of Milton Parker's testimony at the hearing. He urges that Parker's testimony should have been admissible to impeach testimony given in the *Bankers Life* trial. Gilbert mistakes the nature of these disciplinary proceedings. The veracity of a witness in a trial occurring sixteen years earlier was not at issue; the judgment in that case became final when Gilbert failed to appeal. Parker's proffered testimony, allegedly tending to impeach the witness, had no bearing on whether Gilbert failed to disclose material information on his bar application.

■ Gilbert also contends that Judge Thieme erroneously excluded testimony by Gilbert's parents that would have tended to show his lack of intent to conceal *Bankers Life*. Judge Thieme did, however, allow Gilbert's mother and father to testify about his state of mind as he worked on his application. He excluded testimony from Gilbert's mother about her conversations with Gilbert, but permitted her to testify that Gilbert was worried about his criminal record and not his involvement in civil litigation. Judge Thieme also excluded similar testimony from Gilbert's father about Gilbert's state of mind when he was planning to return to law school in 1978. Of course, Gilbert's state of mind when he returned to law school had no relationship to his state of mind when he answered "none" to Question 10. Thus, Judge Thieme properly excluded that testimony by Respondent's father.

Gilbert also argues that his father should have been allowed to testify to his evaluation of the evidence in *Bankers Life*. As discussed above, the merits of *Bankers Life* are not at issue in these disciplinary proceedings, and the father's testimony was accordingly properly limited.

■ Also lacking in merit is Gilbert's contention that the finding of materiality in the disciplinary proceedings effectively convicts him of his wife's murder and thus denies him due process of law. Our determination that the non-disclo-

sure was material relates only to Gilbert's fitness to practice law, not to his guilt or innocence.

██ Gilbert's assertion that laches precludes these disciplinary proceedings is equally without merit. In *Anne Arundel Co. Bar Ass'n v. Collins,* 272 Md. 578, 584, 325 A.2d 724 (1974), we quoted with approval from *In Re Weinstein,* 254 Or. 392, 459 P.2d 548, 549 (1969) as to the defense of laches in a disciplinary proceeding:

> " *'[T]he primary purpose of professional disciplinary proceedings is to protect the public. . . . [I]t would not be in the public interest to dismiss the disciplinary proceedings for no reason other than the Bar's failure to prosecute them with the proper dispatch.'* " (Emphasis added in *Anne Arundel Co. Bar Ass'n v. Collins.*)

In addition, we noted that the party asserting laches must demonstrate prejudice because of the delay.

Gilbert claims prejudice because he can no longer remember why he answered "none" to Question 10. He concedes, however, that the Commission did not delay unduly in instituting grievance proceedings against him. Of course, laches operates to bar a claim only when a party delays in asserting a right. *See Credit Corp. v. Williams,* 246 Md. 575, 587, 229 A.2d 712 (1967). Thus, by Gilbert's own admission, the defense of laches has no application to his case.

## IV.

Having determined that Gilbert violated DR 1–101(A) and DR 1–102(A)(1) and (4), we must determine the appropriate sanction. That no moral character qualification to practice law is more important than truthfulness and candor is well settled. *Attorney Griev. Comm'n v. Levitt,* 286 Md. 231, 238, 406 A.2d 1296 (1979); *In re Application of Allan S.,* 282 Md. 683, 689, 387 A.2d 271 (1978). Gilbert's deliberate failure to disclose *Bankers Life* plainly reflects on his truthfulness and candor during the application process and

hence upon his present moral character fitness to practice law in this State.

We previously determined that the reckless making of a material false statement on a bar application warranted strong disciplinary action. *Attorney Griev. Comm'n v. Rosen,* 303 Md. 60, 492 A.2d 289 (1985). Other states have considered intentional omissions or false statements on bar applications as grounds for disbarment. *See, e.g., State Bar v. Langert,* 43 Cal.2d 636, 276 P.2d 596 (1954) (disbarment for concealment of charges of misconduct in another state on bar application); *People v. Culpepper,* 645 P.2d 5 (Colo.1982) (disbarment for use of false school transcripts in connection with an application); *Florida Board of Law Examiners v. Lerner,* 250 So.2d 852 (Fla.1971) (disbarment for concealment on application of charges of misconduct in another state); *Matter of Farrar,* 242 Ga. 312, 249 S.E.2d 12 (1978) (disbarment for failure to disclose a prior disbarment on bar application to another state); *In re Jordan,* 106 Ill.2d 162, 88 Ill.Dec. 1, 478 N.E.2d 316 (1985) (disbarment for failure to disclose 297 parking tickets, among other omissions, on bar application); *State v. Hartman,* 216 Ind. 89, 23 N.E.2d 477 (1939) (disbarment for failure to disclose on application numerous civil and criminal proceedings); *Matter of Elliot,* 268 S.C. 522, 235 S.E.2d 111 (1977) (disbarment for failure to disclose criminal record on bar application).

Similarly, a number of states have refused admission to applicants who have omitted pertinent information from their applications. *See, e.g., Application of Greenberg,* 126 Ariz. 290, 614 P.2d 832 (1980) (belated disclosure of information reflecting adversely on moral character); *Application of Walker,* 112 Ariz. 134, 539 P.2d 891 (1975), *cert. denied,* 424 U.S. 956, 96 S.Ct. 1433, 47 L.Ed.2d 363 (1976) (failure to disclose belated draft registration); *In re Green,* 464 A.2d 881 (Del.1983) (failure to disclose charges of misconduct in another state); *In re Beasley,* 243 Ga. 134, 252 S.E.2d 615 (1979) (omission of information about involvement in legal proceedings); *In re Ascher,* 81 Ill.2d 485, 44 Ill.Dec. 95, 411

N.E.2d 1 (1980) (failure to disclose pending lawsuit); *In re Mitan,* 75 Ill.2d 118, 25 Ill.Dec. 622, 387 N.E.2d 278, *cert. denied,* 444 U.S. 916, 100 S.Ct. 231, 62 L.Ed.2d 171 (1979) (numerous errors and omissions on application); *In re Willis,* 288 N.C. 1, 215 S.E.2d 771 (1975) (incomplete, inaccurate and inconsistent responses to questions about criminal activity); *Application of Jenkins,* 94 N.J. 458, 467 A.2d 1084 (1983) (failure to disclose involvement in both criminal and civil proceedings).

Gilbert relies upon *Hallinan v. Committee of Bar Examiners,* 65 Cal.2d 447, 421 P.2d 76, 55 Cal.Rptr. 228 (1966) as supporting a lesser sanction than disbarment. There, the court determined that the applicant's omissions were not material. Hallinan had listed numerous arrests, but failed to include a minor conviction in England, and to list his status as an intervenor in a will contest. In light of Hallinan's actual disclosures and the court's characterization of his offenses, it concluded that the non-disclosures had no effect on the determination of Hallinan's fitness to practice law. 421 P.2d at 94–95, 55 Cal.Rptr. 256–57.

Gilbert also relies on *In re Hadzi-Antich,* 497 A.2d 1062 (D.C.1985), a case in which the court ordered a public reprimand for an attorney who had misrepresented his credentials on an employment application. Unlike either Hallinan's or Hadzi-Antich's misconduct, Gilbert deliberately failed to disclose vitally significant material information on his bar application that he knew raised very serious questions about his fitness to practice law.

■ Not every purposefully dishonest misrepresentation on a bar application may warrant the extreme sanction of disbarment. In this case, however, considering the gravity of Gilbert's misconduct, and the absence of any compelling extenuating circumstances, we conclude that disbarment is the appropriate sanction.[3]

---

**3.** The United States District Court for the District of Maryland, on December 6, 1984, refused to admit Gilbert to practice in that court.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JAMES HENRY GILBERT.

Gilbert had applied to that court for admission on August 13, 1984. Shortly before a scheduled hearing before the District Court on Gilbert's application, the court was informed of the non-disclosure of the *Bankers Life* litigation and of Judge Proctor's findings. At the ensuing hearing, Gilbert contended that the omission was unintended that he had no reason to conceal the existence of the civil suit; that knowledge of the civil suit would not have changed the outcome of the character investigation and that the unintended omission had no bearing on his character.

In denying Gilbert's admission, the court noted that the application clearly asked for "all suits" to which Gilbert had been a party and that, while the criminal case against him had been dismissed without findings being made, Judge Proctor in the civil case had made extensive findings as to Gilbert's role in his wife's death. The court recognized that neither the State Board of Law Examiners nor this Court knew of Judge Proctor's findings. It opined that had such information been disclosed, it may have affected the outcome of the investigation. The District Court concluded that Gilbert's omission of the civil suit was "not unintentional" and that "the omission evidences incomplete rehabilitation and lack of good private and public character." The court further noted its concern over Judge Proctor's findings since "[p]articipation in the murder of one's wife to collect insurance is clearly one of the most reprehensible acts imaginable, one far more serious than the crimes for which James G. has actually been convicted." *See* In the Matter of James G., Misc. No. 2270, filed December 6, 1984 (unreported).