642 A.2d 194

ATTORNEY GRIEVANCE COMMISSION

v.

Jeffrey Thomas JOEHL.

Misc. (Subtitle BV), No. 12, Sept. Term, 1993.

Court of Appeals of Maryland.

June 7, 1994.

Melvin Hirshman, Bar Counsel, and James P. Botluk, Asst. Bar Counsel for the Atty. Grievance Com'n of Maryland, for petitioner.

Durke G. Thompson, Chevy Chase, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

KARWACKI, Judge.

In a petition filed in this Court on April 19, 1993, the Attorney Grievance Commission charged Jeffrey Thomas Joehl, the respondent, a member of the Bars of this State and of the District of Columbia, with professional misconduct. The allegations arose primarily out of certain representations and omissions made by Joehl in connection with his application for admission to the Bar of this State. The petition alleged that Joehl had violated Rules 8.1, 8.4(b), 8.4(c), and 8.4(d) of the Maryland Rules of Professional Conduct.[1]

---

1. Maryland Rule 1230 adopts the Maryland Rules of Professional Conduct. The rules alleged to have been violated provide as follows:

"**Rule 8.1. BAR ADMISSION AND DISCIPLINARY MATTERS.**
An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
(a) knowingly make a false statement of material fact; or
(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6."

On April 21, 1993, pursuant to Maryland Rule BV9(b), we ordered that the charges and pleadings be transmitted to Judge William M. Cave of the Circuit Court for Montgomery County for hearing. That hearing was held on September 2, 1993, and Judge Cave's findings of fact and conclusions of law were filed in this Court on January 26, 1994. We quote extensively from that document:

"Respondent submitted an application for registration as a candidate for admission to the Bar of Maryland, dated February 12, 1991. Subsequently, respondent executed an oath, dated November 12, 1991, that all of the matters and facts contained in the original questionnaire were true and correct and no changes had taken place which would reflect unfavorably on his qualifications to be admitted as a member of the Maryland Bar.

"Attached to respondent's application was a list of traffic offenses entitled, 'Traffic Proceedings,' which appears to be a summary taken from this Motor Vehicle Administration traffic record with a number of the entries deleted, showing only the charge and disposition.

"On September 5, 1991, the respondent was interviewed by Donna Jacobs, Esq., on behalf of the Character Committee of the State Board of Law Examiners. Ms. Jacobs was apparently concerned about the extensive nature of his driving record and asked the respondent about that record. The respondent assured Ms. Jacobs that he had become a more responsible driver. He, however, did not inform her that he had three additional convictions for exceeding the

---

"**Rule 8.4. MISCONDUCT.**
It is professional misconduct for a lawyer to:
. . .
   (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
   (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; [or]
   (d) engage in conduct that is prejudicial to the administration of justice."
Maryland Rules of Procedure, Appendix: Rules of Professional Conduct.

speed limit in June [2] of 1990, and had been issued an additional citation on March 9, 1991. Nor did he reveal convictions of other traffic offenses outside of the State of Maryland. The respondent further failed to disclose any of the suspensions before the Motor Vehicle Administration.

"On March 19, 1991, shortly after receiving the citation for exceeding the speed limit by 30 miles an hour, respondent went to Colorado, turned in his Maryland driver's license and applied for and received a Colorado driver's license. He then returned to Maryland to complete his final semester of law school. The respondent has testified under oath that at the time he applied for a Colorado license, it was his intention to take the Maryland Bar and then return to Colorado as a permanent resident thereof.

"It is a little difficult to understand why it was necessary to apply for the Colorado license until such time as he actually moved to Colorado, unless it was for the purpose of obtaining a Colorado driver's license before his Maryland license would be suspended.

"Respondent was born in Colorado. Accordingly, despite possible inferences to the contrary, it is conceivable that he did have the intention to return to Colorado at the time he applied for that license. However, without question, there came a time that he did not return to Colorado, and knew or should have known that a Maryland driver's license was required because he was remaining in the State of Maryland. He nonetheless did not turn in his Colorado license nor did he attempt to get a Maryland license or have his privileges restored.

"In 1987, respondent was charged with the crime of battery. That charge was subsequently nol prossed and respondent would have been entitled to have the matter expunged. At the time of the application to the Bar, however, the matter had not been expunged and respondent was required to list it on his application.

---

2. The citations were actually received by respondent in July of 1990.

"It seems apparent that instead of being totally candid on his application and character interview, the respondent treated that which could have been done as in fact having been done.

"... Now, based on his attitude and demeanor before this Court, the Court is of the opinion that respondent has matured substantially and recognizes the requirement that he be completely candid.

"Bar counsel has also cited the respondent for the guilty plea on January 7, 1992, for the charge of possession of marijuana. Despite the guilty plea, respondent received a disposition pursuant to Article 27, Section 641 [probation before judgment]. The Court is satisfied from the testimony from the respondent that he did not knowingly possess the marijuana. That on the date in question, December 28, 1991, the clothes and marijuana belonged to his wife.

"The Court is further satisfied that the guilty plea was pursuant to the plea bargain to obtain the disposition under Article 27, Section 641."

Based on these findings of fact, Judge Cave reached the following conclusions of law:

"[R]espondent has not violated Rule 8.4(b) because the [guilty plea to the charge of possession of marijuana] was not a criminal act that reflected adversely on a lawyer's honesty, trustworthiness or fitness. Nor did he violate Section (c) or (d) of Rule 8.4 after he was admitted to the Bar."

With respect to Joehl's driving record and battery charge, Judge Cave concluded that "it is doubtful that these would have prevented respondent from being admitted to the Bar. Respondent's sin of omission was greater than his sin of commission." The judge held further:

"As previously noted, the Court does find that respondent did fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter or knowingly failed to respond to a lawful demand for information from an admission or disciplinary authority as required

by Rule 8.1(b). There was, at the very least, a technical violation."

Bar Counsel filed exceptions to portions of the findings of fact and conclusions of law and recommended that, as an appropriate sanction, Joehl be disbarred. Joehl filed no exceptions to Judge Cave's findings and conclusions, but suggested that if a sanction is required, the appropriate sanction is a reprimand.

## I

We observe as a preliminary matter that this Court has original and complete jurisdiction over attorney disciplinary proceedings. *Attorney Griev. Comm'n v. Powell,* 328 Md. 276, 287, 614 A.2d 102, 108 (1992) and cases cited therein; Md. Rule BV9(b). When factual findings are in dispute, we will give deference to a hearing judge's findings "unless they are clearly erroneous, 'giving due regard to the trial court's opportunity to assess the credibility of the witnesses.'" *Attorney Griev. Comm'n v. Goldsborough,* 330 Md. 342, 356, 624 A.2d 503, 509 (1993) (quoting *Powell,* 328 Md. at 287–88, 614 A.2d at 108). *See also Attorney Griev. Comm'n v. Kemp,* 303 Md. 664, 674, 496 A.2d 672, 677 (1985). Nevertheless, as we stated in *Powell,* "the ultimate decision as to whether an attorney has or has not been guilty of misconduct is to be made by us." 328 Md. at 287, 614 A.2d at 108 (quoting *Attorney Griev. Comm'n v. McBurney,* 282 Md. 116, 122, 383 A.2d 58, 61–62 (1978)). Applying this standard, we will review the exceptions filed by Bar Counsel.

## II

Bar Counsel contends, among other things, that the trial court erred in failing to address whether Joehl made misrepresentations to the inquiry panel when he testified before it in December, 1992. Although this charge was included in the original Petition for Disciplinary Action, Judge Cave did not address it in his findings of fact. Ordinarily, such a failure to address an issue might require a remand to the trial

court, but in view of the uncontroverted testimony in the case *sub judice*, we are convinced that there is no genuine issue of fact to be decided.

Joehl testified before the inquiry panel that he was not aware his driver's license was suspended at the time he received three speeding citations in July, 1990 and when he was arrested on December 28, 1991, for possession of marijuana.[3] The relevant testimony before the panel consists of the following:

"MR. BOTLUK: Was your license suspended when you received the three citations in July of 1990?

"MR. THOMPSON: Same objection. He may answer if he knows, but.

"MR. JOEHL: I don't know.

"MR. NALLS: He says he doesn't know.

"MR. JOEHL: I would assume not, though, that it was not suspended.

"MR. BOTLUK: And what do you base that assumption on?

"MR. JOEHL: Well, just looking at the record. First of all there's no, I wasn't charged with it and second of all, I avoid driving when my driver's license is suspended."

According to Joehl's driving record, however, a 180–day suspension was imposed following a hearing on March 23, 1990. Joehl's license was surrendered to the MVA on that same day. Moreover, when asked at trial if he was in attendance at the March 23, 1990 hearing, Joehl replied, "Yes. If there was any hearing, yes, I would be there." Joehl further stated, in reply to an inquiry as to whether he surrendered his license on that day, "Again I don't recall specifically the specific hearing or— but if the record so reflects, then yes." No reasonable individual could believe that a 24–year–old healthy college graduate with postgraduate legal education[4] did not know,

---

**3.** Joehl's driving license was suspended in November, 1991, for failing to appear in the District Court of Maryland to answer a citation.

**4.** Respondent graduated from law school in May, 1991.

four months after personally attending a hearing and surrendering his driver's license to authorities, that his license had been suspended. In fact, the driving record reflects that Joehl's license was not returned to him until September 18, 1990—two months after the July, 1990 citations were issued.

In further support of his allegation of false testimony, Bar Counsel points to the following testimony also given before the inquiry panel:

"MR. BOTLUK: Was in fact your license suspended at that time [of the December 28, 1991 accident and arrest]?

"MR. JOEHL: Apparently so. Not to my knowledge. I did not know it at the time, apparently it may have been a failure to appear, I had been moving a lot and I had not been notified, keeping the MVA notified of my moves."

In fact, Joehl acknowledged at the hearing before Judge Cave that not only had he received a notice from the Motor Vehicle Administration regarding his suspension, but that at the time of his December, 1991 arrest, he carried with him a check to pay the fine. He testified as follows:

"Q. [MR. BOTLUK]: And did you appear in court on January 22, 1992, in reference to those charges [arising from the December, 1991 arrest]?

"A. [MR. JOEHL]: Again I'm not sure about the date, but I did appear in Court on reference to those charges in January of 1992.

. . . . .

"MR. BOTLUK: In the course of the hearing did you or your counsel indicate that at the time you were arrested that you had a check in your pocket to pay the citation that caused your license to be suspended?

"MR. JOEHL: Apparently so, yes. I had no present recollection of that before I looked at the transcripts again.

"MR. BOTLUK: Having looked at that, do you have any recollection about that check?

"MR. JOEHL: Yes, I do. I had a check written to pay a fine, I believe, in reference to a failure to appear suspension

which was going to be put into effect. And I was going to pay it before it actually went into effect.

"MR. BOTLUK: Well, what did you base the information on to the effect of when that would go into effect?

"MR. JOEHL: On—I cannot recall specifically, but from past—from my previous experience with these things, you receive a notice from the MVA or from the District Court telling you that you have a failure to appear and you have 30 days before they impose a suspension on you or pay the fine.

"MR. BOTLUK: And did you receive such a notice?

"MR. JOEHL: I believe so, yes."

This testimony simply cannot be reconciled with the testimony before the inquiry panel that is directly to the contrary. The evidence points overwhelmingly to the conclusion that Joehl knew of his suspensions at the time of both the July, 1990 citations and the December, 1991 arrest, notwithstanding his statements to the contrary at the hearing before the inquiry panel. The weight of the evidence is such that, had the trial judge addressed this issue and found otherwise, such a finding would have been clearly erroneous.

It is clear, then, that Joehl, by testifying that he had no knowledge of his suspensions, knowingly made a false statement of material fact in connection with a disciplinary matter in violation of Rule 8.1(a). In doing so, he also engaged in conduct involving dishonesty and misrepresentation in violation of Rule 8.4(c). Bar Counsel's exception to the hearing judge's findings to the contrary is sustained.

Bar Counsel also excepts to Judge Cave's findings and conclusions concerning the December 28, 1991 marijuana incident, arguing that the factual findings that "[r]espondent did not knowingly possess the marijuana" found in Joehl's car on that date and that "the clothes and marijuana belonged to his wife" are unsupported by the record. Joehl testified that he did not know of the presence of the marijuana, and although the record contains a substantial amount of evidence that

tends to belie Joehl's testimony,[5] the matter is, in the final analysis, one of credibility. Judge Cave was "satisfied from the testimony from the respondent that he did not knowingly possess the marijuana ... [and] further satisfied that the guilty plea was pursuant to the plea bargain to obtain the disposition under Article 27, Section 641." Despite the volume of evidence to the contrary, there is some evidence to support the contention that Joehl did not know of the presence of the marijuana. We did not have the opportunity personally to assess Joehl's credibility, and we cannot say that the hearing judge's findings and his assessment of Joehl's credibility are clearly erroneous in this instance. This exception is overruled.

Bar Counsel also asserts that error lies in the lack of a finding that Joehl obtained his Colorado driver's license fraudulently and that such information should have been revealed in the bar application. Judge Cave acknowledged that it was

---

**5.** Bar Counsel relies on the fact that nowhere in Joehl's testimony does he affirmatively state that the jeans in which the marijuana was found belonged to his wife. Joehl stated only that

"[t]here were a couple pairs of jeans. You're right, they were Levis probably. However, there would be no reason for there ever to be marijuana in the pants pocket of my pants, a pair of jeans of mine."

Bar Counsel also points to the inconsistency between Joehl's testimony at the hearing and answers to interrogatories that he had filed earlier that same morning. The following exchange occurred at the hearing:

"Q. [Mr. Thompson] What is your recollection of the condition of the duffel bag and its contents and how it was in the car as you recall it that day?

"A. [Mr. Joehl] That duffel bag was zipped up in the very back of the car."

In his answer to interrogatories, however, Joehl stated:

"The contents of the duffel bag were not mine. I did not put the bag there and I did not even notice the bag was there when I drove away from home that morning."

Joehl's counsel offered the following explanation for the apparent discrepancy between the interrogatory answer and the testimony:

"And we would proffer to this Court that we would rebut the inference that Bar Counsel asked you to draw simply because in the course of a conversation this morning held between Mr. Joehl and his wife that what was precisely within the car and how it was stored in the car and the like was mentioned for the first time, and I was present for that conversation."

"difficult to understand" why Joehl would obtain a Colorado license while he still lived in Maryland. He also recognized, however, that with Joehl's familial and personal ties to Colorado, it was conceivable that he did intend to return to Colorado at the time he obtained the license. Again, although we may interpret the evidence differently from Judge Cave, we cannot say that the absence of a finding of fraudulent intent was clearly erroneous. The exception to the finding concerning the Colorado driver's license is overruled.

Next, Bar Counsel asserts that the trial judge erred in finding that Joehl would have been admitted to the Bar had he candidly disclosed his entire driving record and battery arrest. We need not decide this question, since speculation about whether Joehl would or would not have been admitted is irrelevant to the issues before us today: whether he omitted material information from his application, and if so, what sanction should be imposed. This exception is therefore overruled.

In his final exception, Bar Counsel alleges error in Judge Cave's findings that Joehl has matured and that he currently "recognizes the requirement that he be completely candid." Joehl's present level of maturity and his appreciation of his ethical obligations are irrelevant to whether or not he violated the Rules of Professional Conduct; they tend to prove only the extent, if any, of his rehabilitation.

### III

We conclude that Joehl has violated several rules of the Maryland Rules of Professional Conduct. For reasons we explained above, we hold that Joehl's false testimony before the inquiry panel violated Rules 8.1(a) and 8.4(c). We also agree with Judge Cave that, by omitting information about his driving record and his battery arrest from his application for admission to the Bar and keeping this information from the character committee representative, Joehl violated Rule 8.1(b). We do not agree, however, with Judge Cave's characterization

of the offense as simply a technical violation, as the information withheld was certainly material.

In *Attorney Griev. Comm'n v. Gilbert,* 307 Md. 481, 493, 515 A.2d 454, 459–60 (1986), we adopted the test of materiality stated in *Matter of Howe,* 257 N.W.2d 420, 422 (N.D.1977) (a material omission is one that "has the effect of inhibiting the efforts of the bar to determine an applicant's fitness to practice law"), and we observed that a determination of the materiality of an omission focuses "on the effect of the particular fact or representation on the decision-making process." In the case at bar, Joehl argues that the information he did provide was of such a nature that Ms. Jacobs, the character committee representative, was well aware of the general import and significance of the driving record. We disagree. Although Joehl disclosed numerous speeding tickets, he did not disclose any of his license suspensions, some of which resulted from a failure to appear in court. He also failed to disclose that he had obtained an out-of-state license under circumstances that were, in the very least, questionable, notwithstanding the fact that he was apparently driving on that license at the time of his interview with Ms. Jacobs. Furthermore, the document submitted with his application lists the date of the most recent offense as July, 1989, lending credence to Joehl's characterization of his poor driving record as the result of reckless youth and to his assertion that he had since matured. Joehl's decision to keep this material information from the Board of Law Examiners allowed him to "characterize the [repeated traffic offenses] in a self-serving and plausible fashion." *Gilbert,* 307 Md. at 493, 515 A.2d at 460. Had it known of recent traffic violations, an out-of-state license, and his multiple suspensions, the Board could have investigated the matter further and made its own determination of whether or not Joehl had "matured" sufficiently. Regardless of whether Joehl would have been ultimately admitted, the decision-making process would likely have been markedly different had Joehl's entire record been disclosed. The omissions were clearly material.

Joehl also seems to attribute little importance to his failure to reveal his 1987 arrest for battery. He admits that he was obligated to report the arrest, but because he had apparently inquired about the expungement process, he contends that he was simply negligent by failing to either follow through on the expungement or to revise his application. Had this been Joehl's only omission, his claim of mere negligence would perhaps be plausible. The totality of the circumstances, however, particularly Joehl's actions with respect to his driving record, casts suspicion on his claim of simple negligence. Had the arrest been disclosed, the Board of Law Examiners would likely have desired to investigate the incident giving rise to the arrest. Joehl's failure to reveal the arrest clearly inhibited the Board's ability to assess his moral character fitness to practice law. This omission, too, was material.

Having determined that Rules 8.1(a), 8.1(b) and 8.4(c) were violated, we must now decide what sanction is appropriate. We have held often that no moral character qualification to practice law is more important than truthfulness and candor. *Attorney Griev. Comm'n v. Myers*, 333 Md. 440, 449, 635 A.2d 1315, 1319 (1994); *In re Application of Allan S.*, 282 Md. 683, 689, 387 A.2d 271, 275 (1978); *Fellner v. Bar Ass'n*, 213 Md. 243, 247, 131 A.2d 729, 732 (1957). The Supreme Court of New Jersey has stated it well:

> "Truth is not a matter of convenience. Sometimes lawyers may find it inconvenient, embarrassing, or even painful to tell the truth. Nowhere is this more important than when an applicant applies for admission to the bar."

*In re Scavone*, 106 N.J. 542, 553, 524 A.2d 813, 820 (1987). On several occasions, we have addressed the deliberate omission of material information on an application for admittance to the Bar. Often, as here, the alleged misrepresentation came to light after the applicant had been admitted to the Bar. We were asked in *Gilbert, supra*, to determine whether an attorney committed a material misrepresentation when he failed to disclose in his application the existence of a civil lawsuit to which he was a party, and if so, what the appropriate sanction should be. Gilbert had been indicted for, among other things,

his wife's murder, but the murder charge had been nol prossed and later expunged. Although Gilbert had disclosed these criminal proceedings in the application process, he neglected to mention that he had been involved in a civil suit to collect the proceeds of two life insurance policies that he had taken out on his wife several months before the murder. At the conclusion of the evidence in a non-jury trial of that civil action, the trial judge denied Gilbert's claim to the proceeds, finding overwhelming evidence that Gilbert had caused his wife's death in order to obtain the proceeds of the insurance policies. We determined that the omission of this information was indeed material and plainly reflected on his truthfulness and candor and hence, on his present moral character fitness to practice law. 307 Md. at 496–97, 515 A.2d at 462. Gilbert was disbarred.

The following year, we were again faced with material omissions from a bar application. In *Attorney Griev. Comm'n v. Keehan*, 311 Md. 161, 533 A.2d 278 (1987), an attorney who was admitted to the Pennsylvania bar sought to be admitted in Maryland. He apparently wanted to avoid the two-day, comprehensive bar exam and instead take the out-of-state attorneys' exam, an exam which is only three hours in duration and limited in subject matter to practice, procedure, and professional ethics. Keehan consequently sought to avail himself of the privilege provided by Rule 14 of the Rules Regulating Admission to the Bar and claimed that he was regularly engaged in the practice of law as the principal means of earning his livelihood. In truth, although he had maintained a small office in rent-free shared space in Pennsylvania, Keehan's primary employment was as a claims supervisor with the United States Fidelity and Guaranty Company in Baltimore. Such employment was not disclosed on Keehan's application. We determined that the omission of this information was material, as it inhibited the efforts of the board to determine whether Keehan's practice of law has been extensive enough to justify the application of the Rule 14 privilege. We observed in Keehan's case that the "deliberate failure to disclose [material information] plainly reflects on his truthfulness and

candor during the application process and hence upon his present moral character fitness to practice law in this State." 311 Md. at 169, 533 A.2d at 282 (quoting *Gilbert*, 307 Md. at 496–97, 515 A.2d at 462). The appropriate sanction in *Keehan* was, as in *Gilbert*, disbarment. *See also Attorney Griev. Comm'n v. Rosen*, 303 Md. 60, 492 A.2d 289 (1985) (attorney who made materially false statement on a petition to take out-of-state bar exam permitted to withdraw with prejudice from Maryland Bar in lieu of further proceedings). Our holdings in these cases are consistent with the American Bar Association (ABA) *Standards for Imposing Lawyer Sanctions*. Standard 7.1 of the Standards provides:

> "Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system."

The commentary to Standard 7.1 specifically states that "disbarment is appropriate when a lawyer intentionally makes false material statements in his application for admission to the bar." *ABA Standards for Imposing Lawyer Sanctions* (1992), *reprinted in* Laws. Man. on Prof. Conduct (ABA/BNA), at 01:835 (June 17, 1992). Other jurisdictions are in agreement. *See, e.g., In re Jordan*, 106 Ill.2d 162, 180, 88 Ill.Dec. 1, 7, 478 N.E.2d 316, 322 (1985) (attorney disbarred for failing to disclose, among other things, 297 unpaid parking tickets in bar application); *In re Scavone*, 106 N.J. at 551, 524 A.2d at 818 (failure to disclose past disciplinary actions on bar application "demonstrated a cavalier and self-centered approach to the truth" and warranted revocation of license to practice law); *In re Cohn*, 118 A.D.2d 15, 47–48, 503 N.Y.S.2d 759, 779 (1986) (failure to disclose pending New York disciplinary actions on application to bar of foreign jurisdiction "erodes the very integrity and competence of the legal profession," and considered with other complaints, charge warrants disbarment).

Relying on Judge Cave's finding that he has matured and now recognizes the importance of candor, Joehl suggests that there are mitigating circumstances which render disbarment

inappropriate in his case. At oral argument, Joehl's counsel cited *Attorney Griev. Comm'n v. O'Neill*, 285 Md. 52, 55–56, 400 A.2d 415, 418 (1979) and suggested that we should consider Joehl's youthful age, his current clean driving record, and his current acknowledgement that his conduct was wrong as mitigating factors. His reliance on *O'Neill* is misplaced. In *O'Neill*, the attorney was not only a new admittee to the bar (he had been admitted for 8 months at the time of the incident and had never practiced law), but the falsehoods in question arose from a single incident, occurred on a single day, and were admitted and regretted by the attorney on that same day. In contrast, Joehl's conduct indicates a pattern of dishonesty over a prolonged period of time: he omitted material facts from his application and lied about them to his character interviewer and to the Bar's inquiry panel. This pattern of conduct reflects adversely on Joehl's truthfulness and candor during both the application and disciplinary processes and hence upon his moral character fitness to practice law in this State. In accordance with the precedent of this Court and the ABA *Standards for Imposing Lawyer Sanctions*, we conclude that disbarment is the appropriate sanction in this case.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV 15 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JEFFREY THOMAS JOEHL.*